**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
:
PERMASTEELISA CS CORP., f/k/a      :
GLASSALUM INTERNATIONAL CORP.,  :
:
      Plaintiff,    :   Civil Action No. 06-2439 (JAG)
:
      v.    :   **OPINION**
:
COLUMBIA CASUALTY COMPANY,     :
:
      Defendant.    :
_____:

**GREENAWAY, JR., U.S.D.J.**

    This matter comes before this Court on the motion of defendant, Columbia Casualty Company ("CNA" or "Defendant"), for summary judgment, pursuant to FED. R. CIV. P. 56, against plaintiff, Permasteelisa CS Corp., f/k/a Glassalum International Corp., ("Permasteelisa" or "Plaintiff"); and on the cross-motion of Plaintiff for summary judgment, pursuant to FED. R. CIV. P. 56, against Defendant.[1]  For the reasons set forth below, Defendant's motion for summary judgment is granted.  Plaintiff's cross-motion for summary judgment is denied.

### I.  FACTUAL BACKGROUND

    The following facts are undisputed unless otherwise noted.  The instant action arises out of the construction of a forty-two story officer tower (the "Project"), owned by Goldman Sachs.

---

[1] On June 23, 2009, Defendant filed a supplemental motion for summary judgment, setting forth further reasons why Defendant is entitled to summary judgment.  Defendant also filed a "Motion to confirm non-jury trial."

(Defendant's Statement of Material Facts, ("Def. 56.1 Stmt."), ¶ 1; Plaintiff's Statement of Material Facts, ("Pl. 56.1 Stmt."), ¶ 1.) In January 2000, Goldman Sachs hired Turner Construction Company ("Turner"), as general contractor for the construction of the building. (Id.) Turner subcontracted the design, fabrication, and installation of a curtain wall[2] for the Project (the "Curtain Wall Contract"), to Glassalum International Corporation, now known as Permasteelisa CS Corporation ("Permasteelisa"). (Def. 56.1 Stmt., ¶ 1; Pl. 56.1 Stmt., ¶ 3.) Permasteelisa began installation of the curtain wall in early January 2002. (Pl. 56.1 Stmt., ¶ 10.)

Defendant contends that as early as March 2002, portions of the curtain wall, specifically the sag rods, were observed by Project consultants, Israel Berger Associates, ("IBA"), to be loose or, in some cases, detached.[3] (Def. 56.1 Stmt. ¶ 7.) According to Defendant, IBA directed Permasteelisa to apply a mechanical fastener or a liquid adhesive to the threaded connection between the sag rods and the collar. (Id.) In December 2003, IBA again noted problems with the curtain wall, including that some sag rods had become detached and had fallen. (Def. 56.1 Stmt., ¶ 8; Pl. 56.1 Stmt., ¶¶ 18, 19.) According to Plaintiff, on May 4, 2004, after continued problems with components of the construction continuing to fall, Turner, at the direction of Goldman Sachs, instructed Permasteelisa "to immediately stop all work performed on [its] scaffolds at the building perimeter due to safety concerns." (Pl. 56.1 Stmt., ¶ 25.)

After May 4, 2004, Permasteelisa met with Turner, Goldman Sachs, and other consultants

---

[2] The curtain wall is a structure that covers the entire building and includes glass panels and an external aluminum "grillwork" system. (Pl. 56.1 Stmt., ¶¶ 6, 7.) The grillwork is purely decorative, meaning that it is non-functional and bears only its own weight. (Def. 56.1 Stmt., ¶ 2; Pl. 56.1 Stmt., ¶ 7.)

[3] According to the parties, a sag rod is a vertical aluminum tube, used on the grillwork portion of the curtain wall. (Def. 56.1 Stmt., ¶ 2; Pl. 56.1 Stmt., ¶ 7.)

to discuss defects in the curtain wall construction. (Pl. 56.1 Stmt., ¶ 26.) Plaintiff contends that at those meetings, Permasteelisa received "demands from both Goldman Sachs and Turner to make the necessary repairs." (Id.) Specifically, in a letter sent to both Turner and Permasteelisa, Goldman Sachs stated, "it is imperative that [Turner] and [Permasteelisa] rectify the dangerous situation created by the defects in the curtain wall as soon as possible . . . ." (Id., ¶ 27.)

During a June 23, 2004 meeting regarding repair of the curtain wall, Turner stated that Permasteelisa "is responsible for [the] remedial work at no additional cost because the work is the direct result of either [Permasteelisa's] design and/or field operations." (Id., ¶ 29.) According to Plaintiff, in June 2004, Permasteelisa began a survey of the curtain wall to assess its problems and identify possible defects. (Id., ¶¶ 31, 32.) After conducting the survey and discovering the defects, Permasteelisa developed a plan to repair the curtain wall, implemented the repairs, and completed work on the Project on or about December 31, 2005.

Upon receiving the Curtain Wall Contract, Permasteelisa enrolled in the Owner Controlled Insurance Program (the "OCIP Policy") that Goldman Sachs had procured and implemented for the Project.[4] (Def. 56.1 Stmt., ¶ 18; Pl. 56.1 Stmt., ¶ 37.) The OCIP Policy was issued by Lexington Insurance Company ("Lexington"). (Def. 56.1 Stmt., ¶ 18; Pl. 56.1 Stmt., ¶ 38.) According to Defendant, the OCIP Policy excluded coverage for claims by an insured against another insured, other than claims by Goldman Sachs against other insureds and claims by contractors and subcontractors against Goldman Sachs. (Def. 56.1 Stmt., ¶ 20.)

---

[4] According to CNA, "OCIPs eliminate the costs to the project owner of overlapping coverage and are intended to protect all the contracting parties by bringing the risk of loss from the project within the insurance coverage of the OCIP." (Defendant's Brief in Support of its Motion for Summary Judgment, p. 7 (internal citation omitted).)

3

Following repair of the wall, Permasteelisa demanded arbitration, seeking reimbursement under the OCIP Policy, after Lexington denied coverage because, among other reasons, no "claim" had been made. (Def. 56.1 Stmt., ¶ 21.) According to Defendant, the arbitrators found, in favor of Lexington, that Goldman Sachs had never made a "claim" against Permasteelisa, as that term was defined in the Lexington Policy. (Id.)

Permasteelisa also secured a Contractors' Professional Liability Policy (the "CNA Policy") that was issued by CNA, and had a policy period from November 1, 2003 through December 31, 2004. The CNA Policy's coverage agreement provides in relevant part:

> We will pay all amounts in excess of the self-insured retention up to the limit of liability which you become legally obligated to pay as a result of wrongful act that results in a claim anywhere in the world, provided on the knowledge date set forth on the Declarations no officer, director, principal, partner, or insurance manager knew or could reasonably have expected that a claim would be made.
>
> * * *
>
> A claim arising out of a wrongful act must be first made during the policy term or any applicable extended reporting period. A claim is considered first made when you receive notice of the claim or as set forth in SECTION VI. CONDITIONS, Item C., Your Rights Duties in the Event of a Circumstance.

(Def. 56.1 Stmt., ¶ 24; Pl. 56.1 Stmt., ¶ 47.)

In the CNA Policy, "claim" is defined as "a demand for money or services, naming you and alleging a wrongful act." (Def. 56.1 Stmt., ¶ 25; Pl. 56.1 Stmt., ¶ 48.) "Wrongful act" is defined as "a negligent act, error, or omission in the performance of professional services for others by you . . . ." (Def. 56.1 Stmt., ¶ 25; Pl. 56.1 Stmt., ¶ 49.) "Professional services" is defined as "those services that you are qualified to perform, or anyone for who [sic] you are legally liable is qualified to perform, for others in the capacity as an architect, engineer, land

4

surveyor, landscape architect, construction manager or as otherwise endorsed to this Policy."

(Def. 56.1 Stmt., ¶ 25; Pl. 56.1 Stmt., ¶ 50.)

> The CNA Policy also includes the following condition:
>
> If there is other collectible insurance, including but not limited to project specific insurance, that applies to a claim covered by this Policy, the other insurance must pay first and this Policy is excess over the other insurance. This policy applies to the amount of the claim that exceeds the available limit of liability and any deductibles or retention amounts of the other insurance.

(Def. 56.1 Stmt., ¶ 26; Pl. 56.1 Stmt., ¶ 51.)

According to Defendant, the CNA Policy provides that in the event of a claim, or a potential claim, against Permasteelisa, Permasteelisa was required to "refuse, except solely at [Permasteelisa's] own cost, to voluntarily, without our approval, make any payment, admit liability, assume any obligation or incur any expense." (Def. 56.1 Stmt., ¶ 28.)

Defendant contends that Permasteelisa informed CNA, by letter, of "facts and circumstances that may subsequently give rise to a claim," in connection with the curtain wall construction. (Def. 56.1 Stmt., ¶ 29.) In the letter, Permasteelisa stated that "no formal claim has yet been filed," but requested CNA's pre-claims assistance. (Id.)

By letter dated June 3, 2004, Defendant contends, CNA requested additional information about the potential claim and reserved its rights pending a coverage investigation. (Def. 56.1 Stmt., ¶ 31.) In July 2004, CNA directed Permasteelisa not to admit liability or agree to any repairs. (Def. 56.1 Stmt., ¶ 31.) CNA advised Permasteelisa that the attorney it had retained for Permasteelisa should be involved in efforts to identify the cause of the curtain wall problems, as well as any decisions regarding repairs. (Id.) According to Defendant, Permasteelisa disregarded these instructions, and instead admitted liability and began repair work on the curtain wall. (Def.

56.1 Stmt., ¶¶ 32-35 .)

On April 21, 2006, Permasteelisa filed suit against CNA in the Superior Court of New Jersey, Law Division, Hudson County, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and seeking a declaratory judgment that CNA is obligated to defend, indemnify, and cover Permasteelisa for the remedial work done to the curtain wall.  (Def. 56.1 Stmt., ¶ 36; Pl. 56.1 Stmt., ¶ 52.)  CNA removed the action to this Court on May 30, 2006.  (Def. 56.1 Stmt., ¶ 37; Pl. 56.1 Stmt., ¶ 53.)

Discovery was conducted in the matter, and on October 24, 2008, both parties filed motions for summary judgment.  Defendant contends that CNA is not required to defend, indemnify, or cover the cost to Permasteelisa of the curtain wall repair work, because, (1) no claim was made against Permasteelisa; (2) Permasteelisa was never "legally obligated to pay" for the repair of the curtain wall; (3) Permasteelisa cannot prove that the problems with the curtain wall resulted from a "wrongful act"; and (4) Permasteelisa's violations of multiple conditions of the CNA Policy constitute breach of the agreement, so as to justify relieving CNA from its obligations under the agreement.

Permasteelisa refutes Defendant's arguments, and contends that (1) no "other collectible insurance" exists that applies to a "claim" covered by the CNA Policy; (2) Turner did not waive its right to make a claim against Permasteelisa by virtue of the joint defense provision of the Lexington insurance policy; and (3) a "claim" was made against Permasteelisa, as that term is defined in the CNA Policy.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under FED. R. CIV. P. 56(c), when the moving party demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cascara v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Justofin v. Metro. Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004).  This Court views "the facts in the light most favorable to the nonmoving party and draw[s] all inferences in that party's favor."  Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (internal citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . . that would entitle [them] to a directed verdict if not controverted at trial.'"  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  (emphasis in original) (internal citations omitted)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the

burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). The non-movant cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

### III.  DISCUSSION

The disposition of this motion hinges on how New Jersey law interprets the contractual phrase "legally obligated to pay." The CNA Policy provides in relevant part:

> We will pay all amounts in excess of the self-insured retention up to the limit of liability which you become legally obligated to pay as a result of a . . . wrongful act . . . that results in a claim anywhere in the world . . . .

(Def. 56.1 Stmt., ¶ 24; Pl. 56.1 Stmt., ¶ 47.)

CNA argues that because Permasteelisa volunteered to fix the curtain wall at its own expense; it never became "legally obligated to pay" for the repair work. (Def. Moving Br., p. 17.) Defendant's argument is premised on a definition of legal obligation that generally requires a judicial determination of liability to be assessed against the insured. Although there is a dearth

8

of New Jersey law considering the question of when the legal obligations of insured parties arise, one New Jersey case appears to be directly on point. In Bacon v. American Ins. Co., 330 A.2d 389 (N.J. Super. Ct. Law Div. 1974), aff'd 351 A.2d 771 (N.J. Super. Ct. App. Div. 1976), an insured plaintiff sought monies from its insurer for the value of defective goods sold to a customer, who had offset the amount paid for the damaged goods against monies the customer owed to the insured. The policy provided that the insurer would "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages." Id. at 392. The insured contended that it had been "legally obligated to pay" under a section of the Uniform Commercial Code, which addresses breach of warranty of merchantability and a buyer's measure of damages. The Law Division rejected the insured's argument, stating,

> [t]he test of liability is not the existence of a remedy in the buyer against the seller . . . but a determination of responsibility for satisfying such a remedy . . . Absent the presentation of proofs in a court of competent jurisdiction and a finding by the court or jury of liability, it cannot be said that the seller is 'legally obligated' to pay any damages.

Id. at 393.

Plaintiff attempts to distinguish Bacon from the instant action, on the basis that the Bacon case concerned a policy that required an insurer to pay sums the policyholder became "legally obligated to pay as damages." Plaintiff contends that the absence of the "as damages" phrase from the CNA Policy expanded the Permasteelisa's insurance entitlement to "coverage at the point in time [Permasteelisa] assumes a legal obligation to provide money or services as a result of a wrongful act, not at the point where the amount [Permasteelisa] must pay is formally established by a court or other tribunal empowered to award damages." (Pl. Opp. Br., p. 16.)

This Court disagrees with Plaintiff's interpretation of the case law and with its reading of

9

the CNA Policy.  First, Plaintiff cites no case law that stands for the proposition that the inclusion or exclusion of the phrase "as damages" in anyway changes the plain meaning of "legally obligated," as contemplated by the Law Division in Bacon.  Second, in each case where the "as damages" phrase is employed in an insurance policy, the respective courts focus on the phrase "legally obligated," not on "as damages."

Notably, in Bacon, the court found that, "[w]hile the term 'legally obligated' is undefined in the policy or by [New Jersey] courts, courts in other jurisdictions have defined the term as used in liability policies to signify existence of a legal liability . . . where the policy is a contract for protection against liability, the insured may turn to it for relief as soon as his liability has become fixed and established."  330 A.2d at 393 (citing  Liberty Bldg. Co. v. Royal Indemn. Co., 2 Cal. Rptr. 329 (Cal. Dis. Ct. App. 1960); Stubblefield v. St. Paul Fire & Marine Ins. Co., 517 P.2d 262 (Or. 1973)).

The Bacon decision did not turn on the operation of the phrase "as damages," but rather hinged on when legal liability became fixed and established.  New Jersey has determined that such liability fixes or attaches after "the presentation of proofs in a court of competent jurisdiction and a finding by the court or jury of liability."  Bacon, 330 A.2d at 393.

Permasteelisa also urges this Court, in spite of Bacon, to accept its argument that a legal obligation to pay can arise in advance of a court's determination of liability.  In support of this argument, Plaintiff cites the non-binding decision Potomac Ins., v. Huang, 2002 WL 418008 (D. Kan. Mar. 1, 2002).  In that case, the district court concluded that the insurer had to indemnify an insured who voluntarily undertook repairs for a customer, even though the customer never brought suit against the insured and no judgment was entered against the customer.

10

Permasteelisa fails to mention in its submissions that Kansas law allows for an insured to recover amounts paid to settle a covered claim if the settlement is reasonable in amount and made in good faith.  See Huang, 2002 WL 418008, at *10.

New Jersey employs a similar rule.  See Griggs v. Bertram, 443 A.2d 163, 174 (N.J. 1982) ("We therefore hold that a settlement may be enforced against an insurer in this situation only if it is reasonable in amount and entered into in good faith.").  Those cases which employ New Jersey's settlement rule are factually distinguishable from the instant action because they concern settlement by the insured *after* an insurer has wrongly denied coverage.  See, e.g., id. at 171; but cf. New Jersey Eye Center, P.A. v. Princeton Ins. Co.,  928 A.2d 25, 33 (finding that settlement by an insured with the consent of the insurer constituted a fundamental breach of the insurance contract where the insured had a duty not to assume any obligation without the insurers' consent).

The CNA Policy requires that the legal obligation to pay to be fixed in Permasteelisa before CNA will provide coverage.  This Court finds that Plaintiff had no legal obligation to repair or pay for repairs to the curtain wall as had been established by Bacon.  Instead, Plaintiff voluntarily assumed responsibility to repair the curtain wall, under no preexisting legal obligation to pay.  Permasteelisa's unilateral decision, although well-intentioned, precludes it from recouping the costs of the repair work from CNA.

Defendant is entitled to summary judgment as to Plaintiff's entire declaratory judgment action.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment, pursuant to FED. R. CIV. P. 56, is granted. Defendant's supplemental motion for summary judgment, pursuant to FED. R. CIV. P. 56, is denied, as moot. Defendant's motion to confirm a non-jury trial, is denied, as moot. Plaintiff's cross-motion for summary judgment, pursuant to FED. R. CIV. P. 56, is denied.

Date: June 29, 2009

                                           S/Joseph A. Greenaway, Jr.
                                           JOSEPH A. GREENAWAY, JR., U.S.D.J.